# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAMON EUGENE JOHNSON, # 323929,

        Petitioner,

v.                              Case No. 08-cv-11096
                                  Honorable Nancy G. Edmunds

SUSAN DAVIS,

        Respondent,

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND DENYING AN APPLICATION FOR LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

## I. INTRODUCTION

This is a habeas case filed under 28 U.S.C. § 2254. Petitioner Damon Eugene Johnson, currently incarcerated at the Mound Correctional Facility in Detroit, Michigan,[1] filed this habeas petition challenging his conviction for armed robbery, MICH. COMP. LAWS § 750.529, imposed by an Oakland County, Michigan, circuit court jury. After a re-sentencing hearing on August 28, 2007, Johnson was sentenced as a third habitual offender to fifteen to forty years in prison for the armed-robbery conviction.

---

[1]Petitioner was incarcerated at the Huron Valley Men's Complex in Ypsilanti, Michigan, when he originally filed his habeas petition; however, he has since been transferred to the Mound Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rules Governing § 2254 Cases; see also *Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. However, because the Court is denying the petition in this case, it finds no reason to do so.

In his pleadings, Johnson alleges (1) his due process rights were violated when unduly suggestive and prejudicial identifications by non-eyewitnesses were admitted into evidence, (2) he was denied the effective assistance of counsel when counsel failed to object to the admission of the identification evidence, and (3) there was insufficient evidence to support his conviction. For the reasons stated below, the Court will deny the petition. The Court will also decline to issue Johnson a certificate of appealability and will deny him leave to proceed on appeal *in forma pauperis.*

## II. BACKGROUND

This case arises because of an armed robbery, which occurred at Ruby Tuesday in Farmington Hills, Michigan, on January 2, 2005. During the robbery, a surveillance camera captured a video of Johnson in the restaurant wearing a distinct jacket, boots, and a mask over his face. He was arrested at Fishbones, his place of employment, on January 27, 2005. Trial began on October 17, 2005, and revealed the following testimony.

Lynette Richey, the manager of the Ruby Tuesday restaurant and the victim in this case, testified that, on Sunday, January 2, 2005, as part of her usual duties, she arrived at about 9 a.m., to ready the restaurant for its 11:00 a.m. opening. Because one or two cooks normally come at that time as well, she waited for a few minutes in her car before entering the restaurant. When nobody else came along, she decided to go inside. She could tell from the alarm system that it was 9:04 a.m., when she unlocked the front door and walked into the restaurant. She said she then locked the door behind her, disengaged the alarm, turned on the lights, checked the circuit breaker and freezer, and went into her office. She set her belongings down, including her keys, and began reading a note that had been left for her. Richey testified that, as she was reading the note, the door came open a little bit.

She said she turned around and saw a man pointing a gun at her.  She could only see the man's eyes.  He said, "Bitch, give me the money."  Trial Tr. vol. I, 107, Oct. 17, 2005.  She said he had the gun pointed at her head.  She said she was scared.

Richey further testified that she told the man not to shoot and that she needed the keys that were behind him.  She grabbed the keys, opened the file cabinet, and removed the tills, setting them on the desk.  The man grabbed some money and then said, "Don't play with me.  I want what's in the safe."  Trial Tr. vol. I, 108, Oct. 17, 2005.  Richey said she continued to talk to him and asked him not to shoot her.  She had to bend down to open the safe.  She opened the safe, grabbed the key, and opened the second part of the safe and gave him the deposit.  The man then said, "Give me what else is in there."  Trial Tr. vol. I, 109, Oct. 17, 2005.  Richey said she explained to him that they make bank deposits everyday and that she had given him all there was.

Richey testified that, during that time, a buzzer started ringing, signaling that someone, an employee, was at the back door wanting to get in.  The robber began looking back and forth to see if someone was coming.  After a time, the buzzer stopped.  The robber then left the office.

Richey said she knew the robber exited the back door when she heard the alarm go off.  Knowing the robber had left, she went to the back door, hoping to find the cook.  She said the cook was standing at the back door.  Richey testified that she told the cook what had happened and asked him if he had seen anyone.  He said he did not.  She then called the police.

Richey testified that she described the robber to the police as 6'1" or 6'2", about 180 pounds, and African American.  She told them that the robber had a black cap, a ski-mask

type hat over his face, and was wearing a black leather bomber jacket with a lot of prints in it, blue jeans, and Timberline-style boots. Richey testified that she and the police walked around the parking lot and found some money on the ground. She said there were surveillance cameras in most of the rooms of the restaurant and at the back door. She told the police that the robbery occurred at 9:09 a.m., based on her own knowledge and the surveillance video. She said the robber left the building just before 9:11 a.m. A photo showed her and the robber, with a gun, in the office, and showed what the robber was wearing. The video from the surveillance cameras was played for the jury.

Richey further testified that she went to the Royal Oak Police Department later in January to "look at some things." Trial Tr. vol. I, 130, Oct. 17, 2005. She explained that she began to describe to the detective what the robber had been wearing and then "he showed me what I was there to look at, that's the items that I was describing." Trial Tr. vol. I, 131, Oct. 17, 2005. Richey identified the jacket as the jacket the gentleman was wearing on the day in question. Richey also identified the boots "like the boots" the robber had on. Trial Tr. vol. I, 133, Oct. 17, 2005.

Sergeant Edward Torley of the Michigan State Police, qualified as an expert in the area of forensic video analysis, testified that he was contacted by Farmington Hills Detective Bonnie Unruh regarding an armed robbery and that he viewed images from a restaurant security system. Sergeant Torley testified that he "exported" photo images from the video, clarified some, changed luminance values to lighten some, and enlarged some. In particular, the Sergeant noted that the exhibit depicting the jacket showed a jacket that had some unique characteristics. In Sergeant Torley's opinion, the design in the photo exhibit and the design in the jacket had similar characteristics.

4

Farmington Hills Patrol Officer and Evidence Technician Scott Rzeppa testified that he was dispatched to the Ruby Tuesday restaurant and met with Detective Unruh, who was already at the scene. He photographed the scene. After watching the surveillance video, he looked at certain areas for fingerprints, such as the tills, the safe, and the office-door handle. He found nothing to report but testified that the lack of fingerprints was not unusual. On cross- examination, Officer Rzeppa agreed that the surveillance video showed that the suspect did not wear gloves. However, on redirect examination, he agreed that the surveillance video showed manager Richey reaching into the safe and agreed that he did not find any of her fingerprints either.

Officer Rzeppa further testified that, based on his observation and information from the manager, that the slot in the till for twenty-dollar bills was empty. While watching the surveillance video, he said he saw something that appeared to be a dollar or other denomination bill falling from the suspect's left pocket.

Detective Unruh testified that she was dispatched to Ruby Tuesday on the day in question. Detective Unruh testified that while at the scene, her attention was directed to two twenty-dollar bills laying on the ground in a puddle of water outside of the restaurant. The bills were collected and sent to the Michigan State Police lab for examination. She also collected the surveillance video and made a request to the Michigan State Police that pictures be made from the video.

Retired Royal Oak Police Detective Thomas Poff testified that he was involved in helping Farmington Hills investigate an armed robbery in January 2005, through the crime suppression task force. He gave information to Farmington Hills regarding a possible suspect. He also informed Farmington Hills when he learned that the possible suspect was

going to be in Detroit at Fishbones Restaurant.  Detective Poff contacted Farmington Hills after the person, identified as Johnson, was arrested and brought to the Royal Oak Police Department.

Detective Douglas Edgar of the Oakland County Sheriff's Department testified that as part of a fugitive unit he helped apprehend a suspect on January 27, 2005, at Fishbones in Detroit.  Johnson was the person apprehended and then arrested.  Detective Edgar testified that, after the arrest, he was directed to the employee closet and took possession of Johnson's jacket.

Royal Oak Police Officer Jamie Hill testified that, in January 2005, he was part of a special task force unit and helped with an arrest of an employee at Fishbones in Detroit. He also identified Johnson as the person arrested that day.  Officer Hill searched Johnson's vehicle pursuant to a search warrant and found, among other things, a pair of tan or brown boots.

Detective Poff received Johnson's jacket and boots and showed them to Richey.

Detective Unruh confirmed that Detective Poff turned over to her a leather jacket and Timberline boots.

Farmington Hills Detective Michael Flatt testified that he was provided with a still photo of the suspect of the Ruby Tuesday robbery and that he and Detective Loe showed it to employees at Fishbones the day after Johnson was arrested.

Michelle Knoblock testified that she was a manager at Fishbones and that she knew Johnson because he worked there.  However, she said she did not know him very well. Knoblock said she was present when he was arrested at Fishbones.  She also said a detective came to the restaurant and told her he was investigating a crime and wanted her

to look at a picture. Although Knoblock said she talked to the detective before Johnson's arrest, Detective Flatt testified that he talked to all three Fishbones's employees after the arrest. Knoblock recognized the picture shown to her by the detective, although she believed the photo shown to her was much clearer than the exhibit. She said the detective asked her if she recognized the person in the photo. Knoblock testified that she told the detective "it could be Damon Johnson." Trial Tr. vol. I, 158, Oct. 17, 2005.

On cross-examination, Knoblock agreed the detective told her that he was investigating a crime and mentioned that the suspect was an employee of the restaurant. She also agreed that she suspected the person was Johnson. Knoblock explained that, although she told the detective the person looked like Johnson, the photo she saw "was a lot clearer and you could see a lot more of the details of the face, but I really wasn't, you know, absolutely positive." Trial Tr. vol. I, 163, Oct. 17, 2005.

On redirect examination, Knoblock was asked whether she said the photo looked like Johnson because the officer was looking for him or because she actually thought it looked like him. Knoblock responded, "Well, the picture that I saw was much clearer than that, and then with them saying that they were investigating [Johnson], they showed me a picture, you put one and one together and the picture that I saw looked a lot more like [Johnson] than the picture that you have today." Trial Tr. vol. I, 166, Oct. 17, 2005.

Ruby Lanier testified that she was a cashier at Fishbones and that she was familiar with Johnson because they worked together. She testified that she was at Fishbones when Johnson was arrested. Lanier said a detective came to the restaurant and showed her a picture. She testified that she told the detective the person in the photo "kind of" looked like Johnson. Trial Tr. vol. I, 170, Oct. 17, 2005. She said the detective did not influence her

opinion. On cross-examination, Lanier said Johnson had already been arrested when the detective came to talk to her. However, she did not know that the detective wanted to talk with her about him.

Paleomn Gonzalez testified that he was a chef at Fishbones and that Johnson worked for him as a cook. Gonzalez said he was not present when Johnson was arrested but was informed of his arrest by the other employees. He identified, in court, a photo shown to him by a police detective. When asked to be specific, Gonzalez stated that the detective "asked me if I recognized the picture. If it looked like somebody that I know." Trial Tr. vol. I, I 33-34, Oct. 17, 2005. Gonzalez described the photo as "very blurry" and testified that he said it "looks like" Johnson. Trial Tr. vol. I, 134, Oct. 17, 2005. Gonzalez testified that he was not sure whether or not the detective mentioned Johnson's name when the photo was shown to him. On cross-examination, Gonzalez stated, "From what I've seen then and what I see now, it's very blurry. I can't say yes, it is him or not. I mean, I can't." Trial Tr. vol. I, I 36, Oct. 17, 2005.

Detective Flatt testified that he showed the photo to Knoblock but denied informing her as to why he was there or explaining to her that he was investigating a crime. Detective Flatt also stated that he did not indicate anything to Knoblock about Johnson before he showed her the picture. Detective Flatt said, "I handed her this photo and I asked if she recognized the person in the photo." Trial Tr. vol. I, 192, 200, Oct. 17, 2005. Detective Flatt testified that Knoblock responded immediately, "that's Damon Johnson." Trial Tr. vol. I, 200, Oct. 17, 2005. Detective Flatt said he did not tell Lanier why he was there, either, and asked her, "if she could look at the photo and see if she recognized the person in the photo." Trial Tr. vol. I, 200-01, Oct. 17, 2005. Lanier told him, "It looks like Damon

Johnson." Trial Tr. vol. I, 201, Oct. 17, 2005. Detective Flatt testified that he "[b]asically handed [Gonzalez] a photo and said to him do you recognize this person," and did not say anything about Johnson at that point. Trial Tr. vol. II, 82-84, Oct. 18, 2005. According to the detective, Gonzalez "stated that it looked like Damon Johnson because of the build, posture, and bald head." Trial Tr. vol. I, 183, Oct. 17, 2005.

Detective Sergeant Mary Knox of the Michigan State Police, qualified as an expert in fingerprint analysis, testified that two twenty-dollar bills were examined by another detective, that a fingerprint was found on one of them, and that the print did not match Johnson's fingerprints. Detective Knox explained, however, that the lack of Johnson's fingerprint on the bill did not rule out the possibility that he could have touched it.

The defense called three witnesses and Johnson to testify.

Anita Jackson, Johnson's sister, testified that she recalled getting ready to leave for a 10:00 a.m. church service on January 2, 2005, with her children and Johnson's daughter, who had spent the night. She testified that Johnson called her and told her that he was coming by to pick up his daughter. She said she believed that he arrived around 9:30 and stayed about five or ten minutes.

On cross-examination, Jackson agreed that her home is in Detroit and near the Southfield freeway. She estimated that her mother's house, where Johnson was living, was about a ten-minute drive away. She said Johnson called her that morning at 9:18 a.m., because she looked at his cell-phone records. However, she agreed that she wrote the time of the call as 9:28 a.m. in her written-police statement. She explained that she was not trying to mislead anyone and that it had been some months between the time of the call and her written statement.

9

Johnson's other sister, Nicole, testified that she was staying at her mother's house on break from school and was awakened at about 10:00 a.m., on January 2, 2005, by a phone call from a friend. She testified that around that same time she saw Johnson lying on the couch; he told her that his daughter had gone to get her hair braided. She identified a photograph she took of Johnson and his daughter that day, sometime after 4:30 p.m. The photo showed Johnson wearing a jogging suit and a black and white shirt, but she did not remember if that was the outfit he was wearing that morning. On cross-examination, Nicole agreed that her brother had a coat similar to the one in question and owned a pair of Timberline boots. She testified that she did not see him when she got home at 2:00 a.m., on January 2, 2005.

Johnson's former girlfriend, China Reeves, testified that it was not unusual for Johnson to call her in the early morning hours of the day because he worked midnights. She recalled that he worked full-time at Fishbones and part-time at Cameron Mitchell's Fish Market. She also recognized the jacket and boots as belonging to him. Reeves remembered having a phone conversation with Johnson on January 2, 2005 at 3:00 a.m., and several more phone conversations later that morning. She recalled that they talked about making plans for the day, including taking his daughter and her daughter to get their hair braided. Reeves recalled last talking to Johnson on the phone that morning at about 8:30 a.m. She testified that she made a hair appointment for 10:00 a.m. She said she picked up his daughter at his mother's house about 9:45 a.m. She testified that she saw Johnson at that time when he brought his daughter out to her truck. She estimated that the hair shop was three to five minutes away. Reeves said Johnson came to the hair shop about an hour later to check on his daughter and then left after about thirty-five minutes.

On cross-examination, Reeves testified that Johnson was about 6'-6'1" tall and weighed about 175-180 pounds.

Johnson testified on his own behalf. He said he was employed at the time in question and that he did not have any money problems. He admitted that the jacket and boots belonged to him. He denied owning a red shirt or red-collared shirt. (The surveillance video showed a red shirt or red-collared shirt.) He testified that he came home to his mother's house on January 2, 2005 at about 3:00 a.m. His cell-phone records showed a one-minute phone call to Reeves at 3:01 a.m., and a twenty-three minute phone call to Reeves starting at 3:07 a.m. He testified that he went to sleep at about 4:00 a.m. and woke up at about 8:30 a.m.

Johnson further testified that he was wearing the same jogging suit pictured in the photo. His phone records show a thirty-minute phone call to Reeves starting at 8.35 a.m., another call to Reeves at 9:12 a.m., for zero minutes, and a call to his sister Anita at 9:18 a.m. He said he left at about 9:20 a.m., to go to his sister's house to pick up his daughter. He denied being the person depicted in the surveillance video. On cross-examination, Johnson admitted that the photos show him wearing the jacket on January 2, 2005. He testified that he was 6 feet tall and weighed 190 pounds. He said he was a restaurant cook since 1994, and most recently for Fishbones and Cameron Mitchell's. He said his job as a cook sometimes involved being at the restaurant for opening and closing, and prior to opening, he and other cooks would meet with the manager, and sometimes the manager would have to let him into the restaurant.

The jury found Johnson guilty as charged.

Following sentencing, Johnson filed a direct appeal with the Michigan Court of Appeals, raising the following claims: (1) the trial court erred by admitting the identification testimony of Johnson's coworkers who were not eyewitnesses to the incident, (2) trial counsel was ineffective for failing to object to the admission of the coworkers' testimony, (3) there was insufficient evidence presented to convict him of armed robbery, and (4) the trial court improperly scored offense variable 13.

The Court of Appeals affirmed Johnson's conviction in an unpublished opinion, but vacated the sentence and remanded for re-sentencing. *People v. Johnson*, No. 267149, 2007 WL 1828383 (Mich.Ct.App. June 26, 2007). Johnson then filed an application for leave to appeal the Court of Appeals's decision with the Michigan Supreme Court, raising the same claims. On October 29, 2007, the Supreme Court denied the application. *People v. Johnson*, 480 Mich. 927, 740 N.W.2d 250 (2007).

On remand, the trial court reinstated the original sentence. The Court of Appeals affirmed the sentencing. *People v. Johnson*, No. 280795, 2008 WL 4415621 (Mich.Ct.App. Sept. 30, 2008).

Johnson neither filed a post-conviction motion with the state court nor a writ of certiorari with the United States Supreme Court. Rather, he filed this habeas petition on March 13, 2008, raising the following claims: (1) the trial court erred by admitting the identification testimony of his coworkers who were not eyewitnesses to the incident, (2) trial counsel was ineffective for failing to object to the admission of the coworkers' testimony, and (3) there was insufficient evidence presented to convict him of armed robbery.

### III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's habeas-corpus review of state-court decisions.  Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state-court decision either unreasonably

extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state-court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

## IV. DISCUSSION

### A. Claim I–Improper Admission of Identification Evidence

In his first habeas claim, Johnson alleges that his federal constitutional rights were violated by the admission of identification testimony of his coworkers who were not eyewitnesses to the robbery. In his second habeas claim, he contends that trial counsel was ineffective for failing to objection to the admission of that testimony. Because no objection was made at trial, this claim is procedurally defaulted.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405

14

F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell,* 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state-court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Here, the Michigan Court of Appeals rendered the last reasoned opinion. In denying relief on this claim, it relied upon a state procedural bar–Johnson's failure to object at trial. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state-law ground for refusing to review trial errors. *People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991) (United States Supreme Court has recognized that the failure to contemporaneously object is generally a recognized and firmly established independent and adequate state-law ground for refusing to review trial errors). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain-error review does not constitute a waiver of state procedural default rules. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991).

In this case, the Court of Appeals denied the claim based upon defense counsel's failure to object at trial. It stated:

> Defendant first argues that the trial court erred by admitting the identification testimony of defendant's coworkers, who were not eyewitnesses to the incident. We disagree. To preserve an issue regarding identification procedures, the defendant must raise the issue at trial. Defense counsel did not object to the testimony of the three employees, so this issue is not properly preserved for appellate review.

*Johnson*, 2007 WL 1828383, at *1 (citations omitted).

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). A federal habeas court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Here, Johnson argues that his defense counsel's ineffectiveness during trial provides the requisite cause and prejudice to excuse the default. Therefore, the determination of Johnson's ineffective assistance of counsel claim will determine whether this claim is barred from habeas review.

## B. Claim II–Ineffective Assistance of Counsel

In his second habeas claim, Johnson alleges ineffective assistance of counsel for failing to suppress the coworkers' identification of him. Ineffective assistance of counsel claims are analyzed under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668, 685 (1984). First, Johnson must prove that counsel's performance was deficient–that counsel made errors so serious that he or she was not functioning as counsel

as guaranteed by the Sixth Amendment. Second, he must establish that counsel's deficient performance prejudiced his defense–where the erroneous performance deprived him a fair trial or appeal. *Id.* at 687-88. "There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

Here, Johnson must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Strickland*, 466 U.S. at 690. The Court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* Johnson bears the burden of overcoming the presumption that the challenged actions might be considered sound trial strategy. *Id.* at 689.

In this case, the Court of Appeals determined that Johnson's defense counsel was not deficient. It stated:

> Defendant argues that defense counsel should have moved to suppress the coworkers' identifications on due process grounds. Because the evidence was admissible, defense counsel was not ineffective for failing to object to its admission. In addition, defense counsel actually used the uncertainty of the witnesses' identification as part of his strategy. In his closing argument, defense counsel repeatedly referred to the lack of trustworthy evidence linking defendant to the crime to show that there was reasonable doubt, and pointed to the "dubious" testimony of these three coworkers. This demonstrates that counsel's decision was the result of calculated reasoning, and we will not substitute our judgment for that of counsel in matters of trial strategy. Trial counsel's performance did not fall below an objective standard of reasonableness, and defendant was not deprived of a fair trial.

*Johnson*, 2007 WL 1828383, at *3 (citations omitted).

Johnson's defense counsel clearly delineated his purpose for not objecting to the admission of the identification testimony in closing argument. The Court of Appeals did not

question defense counsel's trial strategy and neither will this Court. Because Johnson has failed to overcome the presumption of a sound trial strategy, this Court cannot say that defense counsel's acts fell outside of the wide range of professionally accepted assistance. Because Johnson's counsel was not deficient, there is no need to discuss whether the conduct prejudiced his trial.

Therefore, the Court concludes that the state court's judgment, regarding Johnson's ineffective-assistance-of-counsel claim, was not contrary to, or an unreasonable application of, clearly established federal law.

Because Johnson's ineffective-assistance claim is without merit, he cannot establish cause for the procedural default of his first claim. Thus, Johnson's first claim is barred from habeas review.

### C. Claim III–Insufficient Evidence Claim

In his third habeas claim, Johnson contends that the Michigan Court of Appeals's conclusion that the evidence was sufficient to convict him is contrary to, or an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979) and *In re Winship*, 397 U.S. 358 (1970). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. at 364. The jury is allowed to make rational inferences about circumstantial evidence in the case, and, through those inferences, find proof beyond a reasonable doubt. *Dell v. Straub*, 194 F.Supp.2d 629, 647 (E.D. Mich. 2001). The Court of Appeals must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. It is the

job of the federal court on habeas review to determine whether the state court's application of *Jackson* was reasonable. *Malcum v. Burt*, 276 F.Supp.2d 664, 686 (E.D. Mich. 2003). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n.16.

Michigan's armed-robbery statute, MICH. COMP. LAWS § 750.529, has three elements, but the only element at issue is whether Johnson actually committed the crime, because both the prosecution and defense conceded that an armed robbery had occurred. Here, the Court of Appeals determined that there was sufficient evidence to convict. It stated:

> The parties do not dispute that an armed robbery took place as depicted in the surveillance video, so the only issue is whether the man in the video is defendant. The Ruby Tuesday manager gave the police a description of the robber as an African-American male, about 6'1" and 180 pounds, wearing a ski mask, a black leather bomber jacket with lots of prints on it, jeans, and brown boots. China Reeves, defendant's fiancée, testified that defendant is "kind of bald," 6'1" and around 180 to 190 pounds. The police showed the Ruby Tuesday manager defendant's jacket and boots, and she agreed that they looked like the items the robber was wearing. She stated that she could not forget the pattern on the jacket, and that the person who robbed her was wearing a jacket identical to the one she was shown. The evidence presented regarding defendant's description and clothing corresponds to the video as well, which the jury was able to view. There was sufficient evidence to identify defendant as the armed robber in this case.

> Defendant's argument that his cell[-]phone records demonstrate that he could not have committed the armed robbery is without merit. The cell[-]phone records indicated that a phone call to Reeves lasted from 8:35 a.m. to 9:05 a.m. The time stamps from the video show that the entire robbery was only about a minute and a half, from 9:09.01 a.m. to 9:10.33 a.m., with the robber exiting the restaurant at 9:10.41 a.m. There was another phone call to Reeves at 9:12 a.m., which lasted for zero minutes, and a subsequent call to defendant's sister at 9:18 a.m. Therefore, these phone calls occurred wholly outside the time frame of the robbery.

> In addition, the distance from the Ruby Tuesday in question to defendant's sister's house is approximately 12 miles and takes about 15

minutes to drive in normal traffic. Therefore, it would have been physically possible for defendant to drive from Ruby Tuesday after the robbery to his sister's house, and to arrive between 9:30 and 9:35 a.m. as defendant's sister testified. A rational jury could have concluded that the prosecution proved beyond a reasonable doubt that defendant committed the armed robbery.

*Johnson*, 2007 WL 1828383, at *3.

The Court of Appeals determined that there was sufficient evidence for a rational jury to conclude that Johnson was the perpetrator of the armed robbery. This Court gives much deference to the determinations of the state courts in sufficiency matters. There is no basis to find that the Court of Appeals did not correctly follow the *Jackson* standard, and therefore, its decision is not contrary to, or an unreasonably application of, clearly established federal precedent. Johnson is not entitled to habeas relief on his insufficient-evidence claim.

### D. Certificate of Appealability

The Court will also decline to issue a certificate of appealability (COA) to Johnson. A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold

inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. When a federal district court denies a habeas claim on procedural grounds without addressing the merits, a COA should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

The Court concludes that jurists of reason would not find its assessment of the substantive or procedural rulings debatable or wrong. The Court thus declines to issue Petitioner Johnson a COA. Nor should he be granted leave to appeal *in forma pauperis*, as any appeal would be frivolous. *See* Fed.R.App.P. 24(a).

## V. CONCLUSION

For the reasons stated, this Court concludes that Petitioner Johnson is not entitled to federal-habeas relief on the claims presented in his petition.

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Court declines to issue Johnson a certificate of appealability and denies him leave to proceed on appeal *in forma pauperis*.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 17, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 17, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager